## BERRY et al. v. CHASE.

(Circuit Court of Appeals, Sixth Circuit. June 11, 1906.)

1. PRINCIPAL AND AGENT—LIABILITY TO THIRD PARTIES—UNDISCLOSED PRINCIPAL.

One who has dealt with an agent cannot upon discovery of an undisclosed principal hold both the agent and the principal liable on the contract, but must elect between the two, and, an election once made, he must abide by it.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Principal and Agent, §§ 513-520.]

2. TRIAL—MOTION FOR DIRECTION OF VERDICT.

In passing upon a motion to instruct a verdict it is not the province of the judge to weigh the evidence, but if there is any evidence which, with the inferences that may legitimately be drawn therefrom, would warrant a verdict in favor of the party against whom the motion is made, such motion should be overruled. A mere scintilla of evidence, however, is not enough to prevent the withdrawal of the case from the jury.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, §§ 376-380.]

3. CONTRACTS—LAW GOVERNING—SALE OF STOCKS.

An order to buy or sell stock on the New York Stock Exchange is governed as to the legality of the transaction by the law of New York, and not by that of the place where the order is given.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 455-461.]

4. GAMING—WAGERING CONTRACT—SALES FOR FUTURE DELIVERY.

An order to sell stocks for future delivery, intended to be executed on the New York Stock Exchange, when executed creates a valid contract, unless both parties joined in the intention that there should be no delivery, but merely the payment of the difference between the market and the contract price.

[Ed. Note.—For cases in point, see vol. 24, Cent. Dig. Gaming, § 22.]

5. BROKERS—SALE OF STOCKS—QUESTIONS FOR JURY.

Evidence considered, and held sufficient to require the submission to the jury of the questions whether a transaction between defendant and a firm of brokers in Tennessee was a sale of stocks by defendant to the firm, or an order by defendant to sell the stock on his account, and, if the latter, whether it was agreed or contemplated that the sale should be made on the New York Stock Exchange.

Error to the Circuit Court of the United States for the Western District of Tennessee.

Leopold Lehman, for plaintiffs in error.

T. K. Riddick, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, delivered the opinion of the court.

The plaintiffs below were a firm of stockbrokers engaged in business in New York. The action was brought to recover an alleged loss arising upon a sale and purchase of Northern Pacific stock by direction of a firm of stockbrokers doing business at Memphis under the firm name of Schloss, Miller & Malone. The defendant W. J. Chase is sued as the undisclosed principal for whom the Mem-

phis brokers acted. There was evidence tending to show that the plaintiffs sold on March 30, 1901, on a New York Exchange, 25 shares of Northern Pacific stock for and on account of Hogan & Co., a firm of Memphis stockbrokers. There was also evidence that before delivery Hogan & Co. dissolved, Hogan dying. Their unfinished business was transferred to the firm of Schloss, Miller & Malone. May 8th and 9th there was a great flurry in Northern Pacific stock, and plaintiffs called upon Schloss, Miller & Malone to deposit $20,000 to protect their previous short sale. Instead of doing this, they directed plaintiffs to buy on the market 25 shares against the 25 shares sold. This was done, at $325 per share. The difference between the price at which plaintiffs had sold and at which they bought was $5,762.50. · This loss was realized May 9, 1901, and Schloss, Miller & Malone notified. Thereupon they notified plaintiffs that their principal was the defendant, W. J. Chase, and asked that the matter be taken out of their account and charged against W. J. Chase. Although thus notified, some time in May or June of 1901, that Schloss, Miller & Malone claimed to be acting for the defendant, Chase, and although requested to take the trades out of the account of Schloss, Miller & Malone, and charge the loss up to a theretofore undisclosed principal, plaintiffs did not do so, and in October of 1901, the account being still unsettled, they claim to have assigned the claim as a claim against Schloss, Miller & Malone to one John P. Darwent, with the right to bring suit in their name against said Schloss, Miller & Malone, or any undisclosed principal they might have. In November following Darwent elected to sue Chase, and this suit was started.

Jacob Berry & Co. had no reason to suppose that Schloss, Miller & Malone were not dealing for themselves, or, if they did, they had no knowledge of the undisclosed principal until after they had realized the large loss for which they sue. But the law is that, when there is an undisclosed principal behind, he may be made liable, although he was never given credit by the seller, provided the circumstances are not such as to make such a result unjust or inequitable. But one who has dealt with an agent cannot upon discovery of an undisclosed principal hold both the agent and the principal liable. He must choose between the two, and an election once made he must abide by it. Mechem on Agency, §§ 695, 696, 698, 700; Fradley v. Hyland (C. C.) 37 Fed. 49; Tuthill v. Wilson, 90 N. Y. 423; Silver v. Jordan, 136 Mass. 319; Ahrens v. Cobb, 9 Humph. (Tenn.) 643; Curtis v. Williamson, 102 B. L. R. 57; Smithurst v. Mitchell, I El. & El. 622.

At the close of the plaintiffs' evidence, and after the defendant, W. J. Chase, had testified, but before the defendant had notified the court of the conclusion of his evidence, the trial judge stopped the case, and instructed the jury to return a verdict for the defendant. Exceptions were duly reserved. The ground upon which the instruction was based was, as stated by the trial judge in his charge, as follows:

"Two questions present themselves to my mind that bar the plaintiffs' right of recovery. The first is that this stock was not bought at the direction of Mr. Chase. Schloss, Miller & Malone directed the buying of that stock at their motion. The second is, it is a Tennessee contract. Mr. Chase made his

contracts and agreements here with Hogan & Co., and their contract was assumed or transferred by some process to Schloss, Miller & Malone. So far as Mr. Chase is concerned, he had no further connection with any brokers, or any contracts except to sell that stock, and if they sold it themselves, and it went to New York, it would be a New York contract between these brokers and the New York brokers, but as between Mr. Chase and the New York brokers it is a Tennessee contract, and, being a Tennessee contract, all that is necessary under the law of Tennessee to avoid liability is to show by the proof that one of the parties to the transaction treated it as merely dealing in futures, in which the party bought or sold, but was not to deliver or receive, and in this case I shall hold the plaintiff has no right of action. That being so, I direct you, gentlemen of the jury, to return a verdict for the defendant."

For the plaintiffs in error, it is now insisted that the court erred in taking the case from the jury, and that there was some substantial evidence upon which the jury might reasonably have found that Schloss, Miller & Malone were authorized to buy as they did 25 shares of Northern Pacific stock on May 9, 1901, for account of W. J. Chase, and also some evidence that the contract was not a Tennessee but a New York contract. An attentive consideration of the evidence leads us to an agreement with this contention.

In passing upon a motion to instruct a verdict it is not the province of the judge to weigh the evidence. In Mt. Adams v. Lowery, 74 Fed. 463, 477, 20 C. C. A. 596, we gave elaborate consideration to the difference between the function of a judge when acting upon a motion for a new trial because the verdict is against the evidence and a motion to instruct for want of evidence. In the latter case we said:

"His duty is to take that view of the evidence most favorable to the party against whom the motion is made—to direct a verdict—and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus. If not, he should, upon the ground that the evidence is insufficient in law, direct a verdict against that party. That there is a mere scintilla of evidence is not enough to prevent the withdrawal of the case from the jury. Such evidence is insufficient in law because so insufficient in fact."

This has been many times reaffirmed and applied by this court. Travelers' Ins. Co. v. Randolph, 78 Fed. 754, 24 C. C. A. 305; Standard Acci. Co. v. Sale, 121 Fed. 666, 57 C. C. A. 418, 61 L. R. A. 337; Shugart v. Atlanta, etc., Ry. Co., 133 Fed. 505, 66 C. C. A. 379.

If we look to the evidence tending to show that Schloss, Miller & Malone had authority from the defendant to sell and buy 25 shares of Northern Pacific stock on the Exchange in New York for and on account of the defendant, Chase, we find: (1) That either Hogan & Co., stockbrokers at Memphis, or Schloss, Miller & Malone, who succeeded to their unfinished trades or deals with or in behalf of Chase, did sell on or about March 30, 1901, 25 shares of Northern Pacific stock at 94 and a fraction. (2) Whether the alleged sale of such shares were made by Hogan & Co. or by Schloss, Miller & Malone is not clear. So far as it is of importance, there was a question for the jury as to whether the sale was made by the one or the other. There was evidence that Chase sold to Hogan & Co. 25 shares of that stock at 94 and something. This Chase testified to. He also swore

that when he did he had no such shares, and had no intention to deliver, and no expectation that he would be called upon to deliver. In short, he sold what he did not have with no purpose to obtain and deliver, and no agreement on his part that he would buy and deliver. According to his view of the matter, he merely intended to make a bet on the rise or fall of the stock, and receive or pay the difference as it might turn out. Now, if there was no evidence conflicting with this, the contract was a Tennessee contract, and governed by the law of Tennessee. For the purpose of breaking down all gambling contracts, the Tennessee statute (section 3166, Shannon's Code) provides that any contract for the sale of products or bonds or stocks shall be deemed a gambling contract and null and void "when either of the contracting parties have had no intention or purpose of making actual delivery or receiving the property in specie." This statute seems to make a contract void regardless of the good faith of one of the parties, if the other had no purpose to receive or deliver. McGraw v. City Produce Exchange, 85 Tenn. 572, 578, 4 S. W. 38, 4 Am. St. Rep. 771; Allen v. Denham, 92 Tenn. 257, 265, 266, 21 S. W. 898. Upon the question as to whether Chase sold to Hogan & Co., or authorized Hogan & Co. to sell 25 shares of Northern Pacific stock on his account, there was conflicting evidence. Thus the witness A. E. Malone, surviving member of the firm of Hogan & Co. and a member of the New York firm of Schloss, Miller & Malone, testified that before dissolution of that firm it had sold 25 shares of Northern Pacific stock on account of W. J. Chase to an unknown purchaser through a firm of New York brokers known as Parnell & Higman. There was also evidence tending to show that this sale is what is called in the parlance of such dealings a short sale, and that no delivery had been made when Hogan's death brought about a dissolution of Hogan & Co. Thereupon Malone, the surviving member, gave notice that it was desirable that all unclosed "trades" and ledger balances should be transferred to Schloss, Miller & Malone. There was evidence that Chase wrote under this written notice a request as follows:

"A. W. Hogan & Co.: Please transfer open trades and ledger balance to the firm of Schloss, Miller & Malone without additional cost.
"Yours truly,                                      W. J. Chase."

From this the jury might infer that whatever deals or trades were unclosed on books of Hogan & Co., and whatever ledger balance there was affecting him, should be transferred to and carried out by Schloss, Miller & Malone. That Hogan & Co. did sell 25 shares of Northern Pacific stock short on account of W. J. Chase is the positive testimony of the surviving member of that firm. Mr. Schloss, of the firm of Schloss, Miller & Malone, was asked:

"At what price originally did Mr. Chase through you sell this stock?"

He answered:

"Well, he did not sell it through us. He sold it through Hogan & Co., and we acquired the short side of it by instruction and consent of Mr. Chase. It was in the neighborhood of 94 or 95. Whatever that amount was, was taken over at the same figures by Schloss, Miller & Malone."

He and Malone both testified that in buying and selling they were to receive a commission of one-fourth of 1 per cent., and that this they divided with the plaintiffs. It is true that Malone did not testify whether the original order from Chase was given to Hogan or himself. Upon the subject of where the order to buy and sell was to be placed or filled, this occurred in the cross-examination of the witness by the counsel for Chase:

"Q. In this transaction, did you have any understanding with him, or any agreement as to where the orders would be placed or filled? A. Mr. Chase would have to state where he wanted the order filled, or we could not fill it. That goes without saying. We were following his instructions. Q. You had instructions to fill it in New York? A. We had certainly had instructions to fill in New York. That goes without saying. We were following his instructions."

The same witness stated that on May 8th and 9th there was a great flurry in Northern Pacific stock, and that on the 8th, after close of New York market for the day, he called upon Chase to make some settlement, and that he said he "would arrange it the next morning, and would either make delivery or put up sufficient money to guaranty us against loss." This he says he did not do, and that he could not be found the next day, on which day the stock went up as high as 1,000, and whereupon plaintiffs called upon them to put up $20,000 immediately. They being unable to find Chase, they wired plaintiffs to pay as high as $350 for 25 shares, and that plaintiffs obtained the necessary shares at $325. That it is not made clear whether Malone was speaking from his own knowledge of Chase's original order to sell given to Hogan & Co., or from entries on the books of that concern, or from his knowledge of the usual course of their business, may be conceded. His examination, and above all his cross-examination, does not seem to have been so shaped as to clear this up.

It may therefore be conceded that the case for the plaintiffs as to Chase's original direction to Hogan & Co., was weak. The matter was somewhat strengthened by the evidence as to what occurred on May 8th, when he was called upon to make a settlement. Then he promised to either deliver the stock, or make a deposit to guaranty Schloss, Miller & Malone against loss. From this, in the absence of other or more credible evidence, it might be inferred by the jury that the sale theretofore made on the New York market had been originally authorized by him. If the jury should infer from all of the evidence that he had directed a sale of 25 shares of Northern Pacific stock to be made on his account in New York, they might also infer that such sale was to be made under the rules and regulations of the stock market of that city, in which case the contract would be a New York contract, and not a Tennessee contract. If the sale was to be made in New York, and the contract was valid under the law of New York, plaintiffs' action would be governed by the law of that state, and not the law of Tennessee where the original order was given. So, too, if the transaction was of a character usually and customarily executed through New York stockbrokers and this was understood by Chase, Schloss, Miller & Malone would impliedly be authorized to make the trade through stockbrokers selected by them in New York.

Under the well-settled law governing such transactions when intended for execution in New York, a contract for future delivery of an article which the seller has not at the time is perfectly valid unless nothing but the difference between the contract and market price was intended to be paid by the parties. To make it a mere wagering contract it is not enough that one of the parties intended instead of delivery to pay the difference between the selling price and the market price when delivery was demandable. Both parties must join in the intention that there shall be no delivery of the specific thing. Clews v. Jamieson, 182 U. S. 462, 21 Sup. Ct. 845, 45 L. Ed. 1183; Irwin v. Williar, 110 U. S. 499, 508, 4 Sup. Ct. 160, 28 L. Ed. 225; Pearce v. Rice, 142 U. S. 28, 12 Sup. Ct. 130, 35 L. Ed. 925; Bibb v. Allen, 149 U. S. 481, 489, 13 Sup. Ct. 950, 37 L. Ed. 819.

The question as to whether the assignee, Darwent, is a real or fictitious person, and whether if he be a real person he is not acting in behalf of Schloss, Miller & Malone as the real plaintiff, is not so clear as to justify at this stage of the case a dismissal of the suit as one not really between citizens of different states. Upon another hearing the matter may be looked deeper into, and if it appear then that Schloss, Miller & Malone are the real plaintiffs, and the assignment a mere device to give the federal courts jurisdiction, the court should then dismiss the suit as one not within its jurisdiction.

Judgment reversed, and new trial awarded.