### In re CLEMENT D. CATES & CO.

(District Court, S. D. Florida. September 7, 1922.)

1. **Bankruptcy ⬅140(3)—Owners of securities sold by pledgee, to whom they had been delivered as collateral by bankrupt stockbroker, not entitled to priority, where proceeds of sale could not be identified.**

Where stock brokerage firm placed securities belonging to its clients with its correspondent as collateral security, and the securities were sold by the correspondent, and the fund in the hands of the firm could not be identified as the proceeds of such sale on bankruptcy of firm, the owners were not entitled to priority of payment.

2. **Bankruptcy ⬅140(3)—Similarly situated claimants treated similarly.**

Where most of the creditors of a bankrupt brokerage firm were owners of stock which had been sold by the firm's pledgee, and the fund available was but a small fraction of the aggregate of the claims, none of such owners were entitled to priority of payment, since the parties, being similarly situated, should be treated similarly.

3. **Bankruptcy ⬅387—Disallowance of priority claims of creditors who did not object to composition held proper.**

Where an offer of composition was made and accepted by some creditors, and the composition was confirmed and the funds distributed without objection on the part of other creditors, the subsequent disallowance of priority claims of such other creditors *held* proper.

In Bankruptcy. In the matter of the bankruptcy of Clement D. Cates & Co. Petition by N. W. Moberly and others for a review of order of referee disallowing priority claims of the petitioners. Order affirmed.

See, also, 280 Fed. 123.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

S. G. Bernard, of Ashville, N. C., and Knight & Adair, of Jacksonville, Fla., for petitioners.

P. D. Gaskins, of Jacksonville, Fla., for trustee.

Martin H. Long, of Jacksonville, Fla., for various creditors.

George M. Powell, of Jacksonville, Fla., for bankrupts.

CLAYTON, District Judge. Clement D. Cates & Co., stock, bond, cotton, and grain brokers, were adjudicated bankrupt. After the adjudication, and during the months of December, 1921, and January, 1922, the claimants, N. W. Moberly, Charles French Toms, Kate M. Laxton, E. M. Rawls, S. L. Roberts, C. T. Rawls, E. C. Palmer, G. A. Petteway, R. H. Boyer, T. H. Chambers, S. M. Harris, D. L. Rainey, E. P. Brownell, Jr., Josephine Laxton, M. E. Deloe, and H. C. Sugg, filed their petitions claiming the return to the petitioners respectively of the securities mentioned in the several petitions, and praying in the alternative that, in the event the return of the securities could not be had (and it appeared that the same had been disposed of), the proceeds arising from such disposition, less any amounts due the bankrupts, be paid to the petitioners. Thereafter, on April 10, 1922, Miles W. Lewis, as trustee of the bankrupts, filed his petition for reconsideration and rejection of the said claims and others, and at that time testimony was taken before the referee, the matter was submitted, and thereupon the referee entered his order of April 13, 1922, disallowing each of the claims as priority claims.

At the meeting of the creditors on April 10, 1922, a composition of 20 per cent. was offered by the bankrupts, and, as appears by the records of this court, was subsequently on, April 26, 1922, confirmed. On April 22, 1922, each of the claimants filed a petition for review of said order of the referee, and in each of the petitions it is contended that the order of the referee was erroneous, in that the referee erred in disallowing each claim as a priority claim. On June 26, 1922, the review was heard before the District Court upon the record, testimony, and oral argument and briefs of counsel.

In the argument of counsel for petitioners, the petitions of Charles French Toms, H. C. Sugg, and G. A. Petteway were presented separately from the others; but it does not appear that the situation of any one of the claimants is, for the purpose of this decision, legally dissimilar from that of the others, and for this reason all of the petitions will be considered together. The substance of the testimony, which is filed under separate cover, is as follows:

Mr. Julian G. Cates, one of the bankrupts, was examined in support of the petition of the trustee for re-examination of the claims in question. The witness testified that none of the stocks or securities for which claims were made was in possession of the bankrupts, that the same were all sold by Thomson & McKinnon, that the funds derived from the various sales were not kept separate, but were placed with the other funds of the bankrupts in the possession of Thomson & McKinnon, and that there was no way of identifying any of the funds. It further appears from the testimony (page 11) that all of the stocks

were hypothecated with Thomson & McKinnon, and were transferred to their name, and placed to the credit of the bankrupts.

By stipulation on page 12 of the testimony, the previous testimony was applied to all the claims, except that certain other testimony would be given as to the claim of G. A. Petteway, which was done, as appears by page 16 and following pages. By the testimony on page 18, the form of receipt used by the bankrupts is referred to, which is as follows:

CLEMENT D. CATES & CO.   No.———

NEW YORK COTTON EXCHANGE
CHICAGO BOARD OF TRADE
SAVANNAH COTTON EXCHANGE

FLORIDA NATIONAL BANK BUILDING

Jacksonville, Fla.——————————192—

Received from _____$———

Across the face thereof, printed in red, appeared the following:
"NOTICE.—The amount specified in this receipt to be used by us as margin, under an agreement that you are to place in our hands a margin of at least 10 per cent. of the par value of all stocks and securities which are purchased or sold short by us for your account and to keep said margin good according to the fluctuation in the market prices of the same, and that on your failure so to do we are authorized without demand or notice of any kind, to close out the whole or any part of said purchases or sales on the New York Stock Exchange or elsewhere at public or private sale. And it is further agreed that all securities from time to time carried in the customer's marginal account or deposited to protect the same may be loaned by us, or may be pledged by us either separately or together with other securities either for the sum due thereon or for a greater sum, all without further notice to the customer."

There was other testimony with reference to the correct amounts of various claims, which is not material to the present inquiry. It also appears that the previous examination of the bankrupts, and also their books and records and the records of the trustee, were before the referee.

[1] The order of the referee disallowing these various claims or petitions for the securities or their equivalent in money appears to be correct. It seems that the law governing claims for securities or their money equivalent is stated in Collier on Bankruptcy (12th Ed.) 990, 991, in this language:

"If property held by the bankrupt in trust passes to the trustee in bankruptcy it will be subject to the interest of the beneficiaries therein; but such beneficiaries will not be entitled to priority of payment unless they can trace the trust property, in its original or some substituted form, in the estate which comes into the hands of the trustee. Money due from a bankrupt as trustee, and which cannot be distinguished from any other money in his possession or under his control, or which is due from him only because he has used the trust funds for his own purposes, or has otherwise misapplied them, cannot be considered as property held by the bankrupt in trust."

To the like effect is the text of Black on Bankruptcy (3d Ed.) 354. And the rule goes to the extent that the burden of proving identification is on the claimant, and that if there be doubt it must be resolved in favor of the trustee. Schuyler v. Littlefield, 232 U. S. 707, 34 Sup.

Ct. 466, 58 L. Ed. 806. In the case of In re J. C. Wilson & Co. (D. C.) 252 Fed. 631, Judge Mayer, in considering the claim of one Rosenthal, passed upon the rights of the claimant, who stood in a position identical with that of the most favored of the claimants here, in that he had paid for his stock in full. Speaking of the Rosenthal claim, Judge Mayer on page 640 and following pages, said:

"There is some danger of a mistaken application of the principle of unjust enrichment, arising from the hardship which an adverse ruling visits upon such a claimant as Rosenthal. But it is important not to be misled by a sympathetic desire to make good, as against other claimants and general creditors, some obvious wrong committed by the broker against his customers. The principle has been tersely stated in Multnomah County v. Oregon Nat. Bank (C. C.) 61 Fed. 912, as follows: 'It is settled that a person may follow and reclaim his property, wrongfully appropriated by another, so long as he can find it. If its form has been changed, he may follow the substantial equivalent of his property, in whatever form. The property into which his own has been changed is impressed with a trust in his favor. But the great weight of authority is against any extension of the rule beyond this.' Where, as in Gormon v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, and Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143, the claimant traces and finds his security or securities of the same kind, he is entitled to that specific security or its equivalent, or his pro rata share, as the case may be. Where, however, prior to insolvency, there has been a conversion into money, he is unable, of course, to trace the security in kind; but he must show that the proceeds of the conversion have gone into a particular fund, and he must be able to identify those proceeds as a part of that fund. Every conversion, theoretically at least, unjustly enriches the fund ultimately found credited to or in the hands of the convertor; but that is not enough."

And on the same page it is said that:

"In the Rosenthal claim at bar, and in similar claims, the difficulty is that the proceeds cannot be traced."

The difficulty is in these cases, and seems to be the same as that in the Wilson Case; that is, that the proceeds could not or cannot be found or traced. The testimony taken on the examination of the bankrupts is not before the court, although it was referred to in the testimony taken before the referee, nor are the accounts and records of the firm of Thomson & McKinnon and the trustee before the court, except that the court is in possession of them as it is of all such papers.

From the testimony it appears that these various securities, when deposited with the bankrupts, were received by them under a form of receipt similar to that set forth above, and were by the bankrupts, upon receipt, placed with the firm of Thomson & McKinnon, their New York Stock Exchange correspondent, as collateral security, and by that firm credited to the account of the bankrupts. These hypothecations, in view of the language printed in red upon the face of the receipts, appear to have been lawful. In re Toole (C. C. A.) 274 Fed. 337, 340, 341. It further appears that, upon the failure of the bankrupts, all of these securities were sold by Thomson & McKinnon, with the result that a credit balance of from $7,000 to $8,000 was produced, but what has become of this balance does not appear, nor is it made to appear, by any testimony or showing which the court can consider sufficient, that the proceeds of the alleged conversion have gone into that particular fund, or can be identified as a part of the fund. On

the contrary, it appears by the testimony of Julian G. Cates, one of the bankrupts, that there is no way that he knew of of identifying the funds so produced.

In the Toole Case, supra, which is a decision by the Circuit Court of Appeals, Second Circuit, the Wilson Case, above cited, is quoted with approval on pages 342 and 343 of 274 Fed. It appears from the record and the argument of counsel that the transactions in the case at bar were all transactions upon or connected with the New York Stock Exchange, and hence the decisions above cited, which were rendered at the place of these transactions, are decisions of particular force and persuasive influence. An order to buy or sell stock on the New York Stock Exchange is governed as to the legality of the transaction by the law of New York, and not by that of the place where the order is given. Berry v. Chase, 146 Fed. 625, 77 C. C. A. 161; Wilhite v. Houston, 200 Fed. 390, 118 C. C. A. 542.

Moreover, the signed cards evidencing the contract between the broker and customer, which is set forth in the decision in Re Toole (C. C. A.) 274 Fed. 337 on page 340, is identical in legal effect, so far as the rights conferred upon the broker are concerned, with the receipt set forth in the foregoing statement of the testimony.

[2] Furthermore, the decision in the Toole Case would make it appear that the rule of equality should be applied between claimants similarly situated, and this is the undoubted rule or equity applicable to this case. It appears from the testimony, and also from the argument of counsel, that nearly all of the creditors of the bankrupts were in a situation similar to that occupied by the claimants, in that they were the owners of stock either purchased on margin or outright. The prayers of the petitions before the court do not ask for equality of participation, but each demands priority. This consideration, when coupled with the fact that the fund available is but a small fraction of the aggregate of the claims, is of itself sufficient to warrant an affirmance of the referee's order.

[3] But there is yet another matter which is of practical importance in the consideration of the referee's order, and that is that before the filing of these petitions, and at a meeting of the creditors at which these very claimants were represented, an offer of composition was made and accepted by the other creditors, and shortly after the filing of these petitions, without any apparent objection from the claimants, or either of them, the composition was confirmed, the funds distributed, and the property remaining in the hands of the trustee returned to the bankrupts.

It is not necessary to decide whether this attitude of acquiescence in the composition and subsequent distribution does or does not operate as an estoppel. However, a bankrupt court is a court of equity, and hence may exact from petitioners, not only equality, but diligence. Moreover, to open up this case by reversing the referee's order would be to open a Pandora's box of litigation and readjustment, and this should not be done upon the petition of litigants who have stood by without objection and permitted the distribution to be made. In re Wilkesbarre Furniture Mfg. Co. (D. C.) 130 Fed. 796.

283 F.—35

For the reasons stated, as well as for the reason that the order of the referee is presumptively correct (In re Williams [D. C.] 120 Fed. 542), it would appear that the order sought to be reviewed should be and is confirmed.